## In re PROVIDIAN FINANCIAL CORPORATION SECURITIES LITIGATION.

No. CIV.A. 00–1467.
MDL No. 1301.

United States District Court,
E.D. Pennsylvania.

July 5, 2001.

Lester Levy, Robert C. Finkel, Wolf, Popper, Ross, Wolf & Jones, New York City, Vincent R. Cappucci, Entwistle & Cappucci, New York City, for plaintiff.

Darryl J. May, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, Robert A. Van Nest, San Francisco, CA, for defendants.

George H. Brown, Heller, Ehrman, White & Mcauliffe LLP, Menlo Park, CA, for movant.

### Memorandum and Order

YOHN, District Judge.

The plaintiffs in this consolidated class action allege that Providian Financial Corporation ("Providian"); its Chairman of the Board, President, and Chief Executive Officer Shalish Mehta ("Mehta"); and its Executive Vice President and Chief Financial Officer David Petrini ("Petrini") all engaged in securities fraud in violation of § 10(b) of the Securities Reform Act of 1934 and Rule 10b–5 promulgated thereunder. The suit began as a series of separate class actions by customers of the defendants and their shareholders which were launched after news that various government agencies had begun investigating Providian's credit card business practices. The investigations ended after Providian agreed to alter some of its business practices, pay restitution to certain account holders, and to pay various fines. The federal suits are still pending but have been consolidated and assigned to this court. The plaintiffs in this portion of the consolidated action dealing with the securities litigation purport to represent the class of persons who purchased Providian common stock on the open market between January 21, 1999 and June 4, 1999.

Before the court is the defendants' motion to dismiss for failure to state a claim or, in the alternative, for failure to plead with particularity. The defendants argue that the Second Amended Consolidated Class Action Complaint (the "SAC") pleads neither the conduct nor the scienter necessary to establish securities fraud. However, upon review, I find that the SAC alleges these basic elements of securities fraud with sufficient particularity.

The SAC alleges that Providian engaged in a series of illegal or fraudulent business practices that artificially inflated the company's financial results and that the statements that reported Providian's results made no mention of these practices but instead attributed the results to Providian's "customer-focused approach."

Drawing all inferences in the plaintiffs' favor, one may reasonably infer that Providian's statements were misleading or that the statements omitted information that was necessary to avoid their being misleading. Also, the SAC makes a number of allegations concerning scienter. First, it is alleged that Mehta and Petrini received various revenue and sales reports that notified them of Providian's dramatic performance in core areas of Providian's business. Second, Mehta and Petrini also received reports of Providian's extraordinarily high intake of late fee and overlimit fee revenues. From these reports, plaintiffs allege that Mehta and Petrini, both senior officers at Providian, knew or should have known about Providian's illegal or fraudulent business practices. Third, it is alleged that Mehta and Petrini played a direct role in creating the sales climate that allegedly led Providian's sales force to mislead customers and illicitly add products to their accounts without consent. The SAC, in essence, alleges that Providian's illegal or fraudulent practices permeated Providian's core business and were so pervasive and obvious that Mehta and Petrini must have known or at a minimum were reckless in not knowing. These allegations support a strong inference of knowledge or recklessness. Furthermore, Mehta and Petrini's knowledge or recklessness may be attributed to Providian as an entity. Given the sufficiency of these allegations, the defendants' motion will be denied.

## I. Background

Providian's primary business, credit card lending, generates two types of revenue: interest and non-interest. Interest revenue comes from finance fees on outstanding credit card loans. SAC at ¶ 32. Non-interest revenue comes from a variety of other sources, including fees for late payments, returned checks, overlimit deb-

its, cash advances, membership, and add-on services. *Id.* Providian's add-on services include programs for healthcare discounts, automobile and travel discounts, credit protection, and mortgage or rent assistance. *Id.* Providian also has various programs to induce consumers to transfer credit card balances from other creditors. *Id.* at ¶ 33. Presumably, the larger the customer pool the lender retains, the larger overall revenue or at least potentially realizable revenue.

The SAC refers to four of Providian's public statements: (1) the January 21, 1999 press release; (2) the Form 10–K filed on March 31, 1999; (3) the April 22, 1999 press release; and (4) the Form 10–Q filed on May 14, 1999. Mehta and Petrini reviewed and approved each of these statements. *Id.* at ¶¶ 49, 50, 54, 60. The statements describe Providian's financial performance, customer-base increases, earnings projections, or "customer-focused" approach.

(1) The January press release announced that 1998 fourth quarter net income was $94.9 million, and full year net income was $296.4 million, "a 55% increase over net income of $191.5 million in 1997." "Total managed revenue for the quarter ... grew by nearly 82% over fourth quarter 1997, to $757.5 million, while year over year, total managed revenue increased to $2.4 billion.... [Interest revenue] increased over fourth quarter 1997 to $364.2 million. For all of 1998, [non-interest revenue] was $1 billion and represented 43% of total managed revenue." Moreover, "[a]ccount growth climbed at an accelerated pace, with over 1.9 million new account relationships established during the quarter." By the end of 1998, Providian managed 8 million accounts, a substantial increase over the number of accounts managed in 1997.

The release quotes Mehta forecasting Providian's future prospects: "Current trends in each of our businesses give me continued confidence in Providian's ability to achieve 50% earnings per share growth in 1999 and to increase our goal for long-term earnings per share growth to at least 25%." Mehta also states that "Providian's performance in the fourth quarter and results for all of 1998 were outstanding.... Our customer-focused engineering approach to consumer lending and our unwavering commitment to flawless execution of our business strategy enable Providian to generate above industry-average returns and to sustain our high growth rate." *Id.* at ¶¶ 41–49.

(2) The Form 10–K reports that for 1998, non-interest revenue from add-on services totaled $165.8 million, compared to $59.3 million the prior year. For 1998, non-interest revenue from late and over-limit fees totaled $176.0 million, an increase from the prior year's total of $80.9 million. Other categories of non-interest revenue also rose as a result of customer volume growth.

The form also describes Providian's customer-focused approach as a technique that involves the use of Providian's "databases and analytical techniques" to "develop[ ] targeting and credit models to identify potential customers.... After an account is opened, account performance is monitored and a variety of account management tools are used to build the customer relationship." *Id.* at ¶¶ 50–53.

(3) The April press release announced Providian's 1999 first quarter results. First quarter net income was "$113.5 million, an 102% increase over the first quarter of 1998." Total managed revenue was $851.1 million, an 88% increase over the first quarter of 1998. Non-interest revenue "grew by 157% over the first quarter of 1998 to $416.2 million, and represented 48.9% of total managed revenue[.]" "Growth in all fee revenue sources was outstanding, including strong add-on product revenue which was up 223% over the first quarter of 1998." Moreover, "Providian added over 1 million accounts during the quarter, bringing total customer relationships to 9 million."

The release again quotes Mehta forecasting Providian's future prospects: "[Providian's] growth initiatives, along with current trends in all of our businesses, give me comfort to raise our 1999 earnings guidance to $3.50 per share, or 72% over 1998, and to increase earnings guidance for 2000 to 35%, or $4.72 per share, over 1999." Mehta also states that "[the] customer-focused approach continues to enable Providian to deliver above average returns." *Id.* at ¶¶ 50–59.

(4) The Form 10–Q reports that for the first quarter of 1999 "credit product fee income was $341.8 million[,]" as compared to $96.4 million during the same period in 1998. "[M]anaged fee-based product revenue totaled $117 million[,]" as compared to $36.4 million during the same period in 1998. "Late and overlimit fees totaled $137.7 million[,]" as compared to $51.7 million for the same period in 1998. For the first quarter of 1999, Providian also experienced increases in other categories of non-interest income. The form attributes some of these revenue increases to customer-base growth. *Id.* at ¶¶ 60–61.

The SAC describes eight allegedly illegal or fraudulent business practices, most of which relate primarily to the generation of non-interest revenue.

(1) Providian charged customers for various fee-based products without getting customer consent. *Id.* at ¶¶ 37(i)(c), (i)(f), 37(viii)(h). Providian's sales representatives used various high pressure sales tactics, and Providian imposed aggressive

sales quotas. The sales representatives, in order to meet their quotas, charged customers for products without their consent. *Id.* at ¶¶ 37(i)(a), (b), (c), (e). Furthermore, customers who complained were channeled to unit managers who themselves received bonuses for fee-based product sales. *Id.* at ¶ 37(i)(b). Finally, instances of sales representatives adding on products to customer accounts became routine and were known to supervisors. *Id.* at ¶ 37(i)(c).

(2) Providian marketed its Credit Protection program as a way for hospitalized or unemployed customers to avoid credit card payments for up to 18 months. *Id.* at ¶ 37(ii). The company also claimed that no interest would be charged during credit protected periods of non-payment. *Id.* at ¶ 37(ii)(a). However, the program's numerous restrictions were not adequately disclosed. *Id.* at ¶¶ 37(ii)(a)(1)-(5). Customers' requests for informational literature were routinely ignored. *Id.* at ¶ 37(ii)(a). Furthermore, although sales materials indicated that there was no charge for Credit Protection on accounts with balances over $5,000, Providian's fee for Credit Protection increased with higher balances. *Id.* at ¶ 37(ii)(b).

(3) Providian marketed its credit cards as carrying no annual fee but failed to disclose that new customers could be and often were required to maintain Credit Protection, for which Providian charged $156 per year. *Id.* at ¶ 37(iii)(a). Also, Providian, in its solicitation letters, indicated that Credit Protection was "included" with the card. *Id.* at ¶ 37(iii)(b). Providian told customers who protested Credit Protection fees that the cancellation of Credit Protection would result in the imposition of annual fees. *Id.*

(4) Providian promised consumers a rate as low as 7.99% on balances transferred from other credit cards, but con-

sumers did not receive rates this low. *Id.* at ¶ 37(iv). If pressed, sales representatives told potential customers that Providian would beat the interest rate they were currently paying but would provide no other specifics. *Id.* at ¶ 37(iv)(b). In reality, Providian would only beat others' rates by as little as .7% to .3%. *Id.* at ¶ 37(iv)(c). Moreover, customers who wanted to take advantage of these savings were required to use Providian's onerous process of "proving-up" a competitor's rates. *Id.* at ¶ 37(iv)(d). Absent proper and timely submission of proof, Providian routinely raised rates as high as 21.99%. *Id.*

(5) Providian promised prospective customers cash rewards of up to $200 for transferring balances, but failed to disclose adequately that a certain minimum balance must be transferred in order to qualify for the reward. *Id.* at ¶ 37(v). For instance, Providian only gave $200 rewards for transfers of $10,000 or more. *Id.*

(6) Providian managers instructed employees to delay posting credit card payments so that the Company could charge late fees on individual credit card accounts. *Id.* at ¶ 37(vi)(a). Moreover, absent a customer complaint, Providian strongly discouraged the reversal of late fees discovered to be erroneous. *Id.*

(7) Providian's legal collections department would routinely agree to allow delinquent customers to pay off their accounts in 4% increments. *Id.* at ¶ 37(vii)(a). Providian often failed to honor these agreements and proceeded to "escalate" collection by taking legal action and assessing the delinquent customers with attorneys' fees ranging from 10% to 33.3% of the outstanding balance.

(8) Providian's home loan department, which managed the mortgage and rent assistance program, began aggressive marketing in late 1997. *Id.* at ¶ 37(viii). Cus-

tomers were often falsely told that interest rates on home loan protection borrowing would not increase. *Id.* at ¶ 37(viii)(g). Just as with Providian's other fee-based programs, sale representatives were very aggressive and would often charge customers for the program without consent. *Id.* at ¶ 37(viii)(h).

Both Mehta and Petrini received periodic sales reports, reports of add-on product revenue, and flash reports of sales performance. *Id.* at ¶ 63. In addition, both received reports from the legal collections department that showed that revenue from late and overlimit fees were extraordinarily high. *Id.* at ¶ 37(vii)(f). Finally, both either approved or allowed the use of misleading sales scripts by Providian's sales personnel. *Id.* at ¶ 63. Both also either approved or allowed the high-pressure sale environment in which the Providian's sale force mislead customers or improperly added-on products to customer accounts without approval. *Id.* at ¶ 65.

## II. Standard of Review

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the complaint. *See Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993). In deciding a motion to dismiss, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the [plaintiff]." *Id.* The court will only grant a 12(b)(6) motion to dismiss if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *In re Burlington Coat Factory Sec. Litig.,* 114

F.3d 1410, 1420 (3d Cir.1997) (quotations omitted).

## III. Discussion

To state a claim under § 10(b) and Rule 10b–5, a plaintiff must plead the following elements: (1) that the defendant misrepresented a material fact or failed to state a material fact necessary to make a statement not misleading and (2) that the defendant acted with knowledge or recklessness. *See id.* at 1417. "Materiality" in this context means "information that would be important to a reasonable investor in making his or her investment decisions." *Id.* at 1425. Moreover, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to act.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Ieradi v. Mylan Labs., Inc.,* 230 F.3d 594, 599 (3d Cir.2000).

In addition to the substantive requirements of Rule 10b–5, the plaintiffs' pleadings must satisfy the heightened pleading standards set forth by Federal Rule of Civil Procedure 9(b) and by the Private Securities Litigation Reform Act. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 530 (3d Cir.1999). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition[s] of mind of a person may be averred generally." Rule 9(b) requires that complaints alleging violation of § 10(b) and Rule 10b–5 must plead all averments of fraud with particularity. *Id.* at 534. Pleadings must specify "the who, what, when, where, and how; the first paragraph of any newspaper story." *Id.*

The Reform Act, in part, mirrors 9(b)'s requirements. It "requires a plaintiff alleging a Rule 10b–5 violation to

'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' "

*Id.* at 530 (quoting Reform Act, 15 U.S.C.A. § 78u–4(b)(1)). Just as under Rule 9(b), allegations of false or misleading statements must be plead with particularity. *See* 15 U.S.C. § 78u–4(b)(1). However, with respect to the scienter element in § 10(b) and Rule 10b–5 actions, the Act's requirements differ from Rule 9(b)'s and supercede Rule 9(b)'s requirements. *See id.; In re Advanta,* 180 F.3d at 531 n. 5. Specifically,

" '[i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' "

*Id.* at 531 (quoting 15 U.S.C. § 78u–4(b)(2)). Accordingly, here the SAC must plead with particularity both the element of misrepresentation or omission and the element of scienter.

Just as under the Rule 9(b), under the Reform Act "it remains sufficient for plaintiffs [to] plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *Id.* at 534–35 (quotations omitted). Mere allegations of motive and opportunity will not suffice, as now allegations of scienter "must be ... supported by facts stated 'with particularity' and must give rise to a 'strong inference' of scienter." *Id.* Moreover, "reckless behavior" involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 535. And "conscious behavior" may be alleged "by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate[,] illegal behavior." *Id.*

The defendants, in their motion for dismissal, argue that the SAC does not show misrepresentation, omission, or scienter and therefore, should be dismissed under Rule 12(b)(6).[1] The defendants also argue that neither misrepresentation, omission, nor scienter are pled with particularity under Rule 9(b) or the Reform Act. After reviewing the SAC, it is apparent that the allegations reasonably

---

1. The defendants also argue that the SAC, in contravention of the Reform Act's pleading requirements, is confusing and ambiguous because it fails to refer to specific statements made by the company and fails to explain how these statements are false or misleading. This argument is meritless. The Reform Act does indeed require the plaintiffs to specify each statement that is false or misleading as well as the reason the statement is false or misleading. *See* 15 U.S.C. § 78u–4(b)(1). However, the SAC, although not a model of clarity or concision, recites verbatim, or closely paraphrases, portions of Providian's public statements and alleges that the statements misrepresented Providian's financial results either because the reported results were false or because of a failure to disclose the nature of Providian's business practices.

support an inference of misrepresentation or omission and support a strong inference of knowledge or recklessness. Furthermore, the SAC's allegations are sufficiently particular.

## A. Misrepresentation

■ The SAC alleges misrepresentation based on Providian's reports of financial performance, projected earnings, customer-base volume, and the role of the "customer-focused approach." The defendants argue that the SAC fails to explain how any of the reports' representations are, in fact, false. Specifically, the defendants argue that the SAC does not allege that the reported financial results were inaccurate. This is, however, a misreading of the SAC.

The SAC specifically alleges that because of the illegal or fraudulent sales practices, the statements misstated or inflated Providian's financial results. *See* SAC at ¶¶ 2, 10. Furthermore, Providian allegedly overstated revenues and net income in violation of generally accepted accounting principles ("GAAP") by reporting at least $20 million in late fee that were not actually earned. *See id.* ¶¶ 2,4. Under generally accepted accounting principles, where an asset is subject to probable loss and the loss can be estimated, the asset should not be "realized" for the purposes of computing revenue, profit, and the like. *See* SAC at ¶ 62, Defs.' App. at Tab K ("Statement of Financial Accounting Standards No. 5"). It is alleged that in computing financial results Providian realized revenue and profits generated from its illegal or fraudulent business practices, even though legal challenge of these practices was or should have been certain. Moreover, one may reasonably infer that the loss could be estimated to be in the amount of the allegedly ill-gotten gains derived from the unlawful practices.

Drawing all reasonable inferences in the plaintiffs' favor, the SAC manages to show misstatement of financial results. Furthermore, the SAC describes each of the allegedly illegal or fraudulent practices in detail, gives reasons for describing the practices as illegal or fraudulent, and explains how the practices would inflate income and revenue. The allegations are therefore sufficiently particular.

The defendants also argue that the facts alleged do not establish misrepresentation based on the reports of earnings projections or customer-base increases. The plaintiffs do not contest either of these arguments and is therefore presumed to concede these points. Moreover, the SAC itself makes clear that the plaintiffs do not intend to establish liability on the basis of the reports of earnings projections. *See* SAC at ¶ 103 ("The statements alleged to be false and misleading herein all relate to then-existing facts and conditions, including defendants' dissemination of financial statements that were in violation of GAAP.") Furthermore, the plaintiffs state that they are "not alleging that Providian did not actually increase the number of its credit card accounts. Instead, plaintiffs are alleging that the reason why such accounts increased was that the Company was engaged in undisclosed, fraudulent and unlawful practices." Pl.'s Mem. at 27. Hence, the SAC is alleging that statements concerning the customer-base volume were misleading due to omission, not due to plain falsity.

■ Finally, the defendants argue that their statements concerning Providian's "customer-focused approach" are no more than positive portrayals of optimism and as such are not material. "Materiality" in this context means "information that would be important to a reasonable investor in making his or her investment decision." *In re Burlington,* 114 F.3d at 1425.

"Vague and general statements of optimism constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Advanta,* 180 F.3d at 538 (quotations omitted).

The press releases and 1998 Form 10–K attribute Providian's income and revenue successes to Providian's "customer-focused approach." Although the statements do not suggest that this approach is the sole reason for Providian's success, the statements do suggest that the approach is a significant factor in Providian's success. The SAC alleges that the illegal or fraudulent, profit-inflating practices, not the customer-focused approach, are the primary reason for Providian's success. *See* SAC at ¶ 62. Assuming the truth of the plaintiffs' allegations, it is plain that the SAC alleges misstatement of the cause of Providian's success. Furthermore, it is plain that these allegations are sufficiently particular.

### B. Omission

■■■ The defendants argue that any disclosures they could have made about their business practices would have been immaterial. Again, "undisclosed information is considered material if there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." *Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir.2000) (quotations omitted); *see also In re Westinghouse Sec. Litig.,* 90 F.3d 696, 714 (3d Cir.1996); *In re Time Warner Sec. Litig.,* 9 F.3d 259, 268 (2d Cir.1993) ("A duty to disclose arises whenever secret information renders public statements materially misleading, not merely when that information completely negates the public statement."); *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 641 (3d Cir.1989) ("In addition to the duty to disclose specific information required by law ... Rule 10b–5 impose[s] upon the defendants a duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading.").

The SAC alleges material omission more plainly than it alleges straightforward material misrepresentation. It is alleged that Providian billed customers for add-on products they did not order, made its Credit Protection and Home Loan Protection programs attractive by misrepresenting the program's terms, attracted new customers by misleadingly claiming that its cards carried no annual fee and by suggesting significant interest rate discounts and cash rewards for transferred balances, systematically delayed posting customer payments so as to generate late fees, and misled delinquent customers into paying onerous penalties for their delinquency. The SAC alleges that these practices artificially inflated Providian's revenue, profits, and customer-base. Although it is conceivable that the alleged illegal or fraudulent conduct was isolated, in making all reasonable inferences in the plaintiffs' favor, it must be inferred that the misconduct was more than isolated and contributed significantly to Providian's financial performance and customer base.

As the defendants point out, it is certainly true that the defendant does not have a Rule 10b–5 duty to disclose mere speculations of investigation or litigation or generally to disparage Providian's business practices. Such disclosures would have no effect on the total mix of information available to a reasonable investor. However, the statements attribute Providian's good fortunes to its "customer focused approach." Indeed, this assertion puts the topic of the cause of Providian's success in play. Having put the issue in play, Providian is obligated to disclose information

concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281–82 (Management practices "used to reach a particular statement of loan loss reserves, earnings, assets, or net worth" need not necessarily be disclosed under securities law, but where a bank characterizes its management practices as "conservative" and "cautious", the bank puts the issue of management practices "in play" and is bound to speak truthfully about the practices.); *United Paperworkers Int'l v. Paper Co.*, 801 F.Supp. 1134, 1143 (S.D.N.Y. 1992) ("[S]ince the [company] chose to offer specific representations about [its] environmental record and policies, it was obligated to portray that record fairly."). Were Providian engaged in a series of illegal or fraudulent business practices and were those practices responsible for inflating revenue, profit, and the customer base, such information would clearly alter the mix of information available to the public as to the source of Providian's success and the viability of full realization of Providian's reported profits. Given that the court must assume the truth of the allegations and draw all inferences in the plaintiffs' favor, it is plain that the SAC makes out a claim of material omission.

### C. Scienter

█ The defendants argue that the SAC does not establish that any of the defendants knew or should have known that Providian's practices were inappropriate or would result in a $300 million settlement. However, the SAC amply alleges both that Providian as an entity and Mehta and Petrini as individuals knew or should have known that the statements were false or omitted material information. The allegedly inflationary practices relate to a core aspect of Providian's business. Both individual defendants are high-level managers knew or should have known of the alleged "deficiencies in billing and accounting and materially false and deceptive sales practices, core to Providian's existence as a credit provider." SAC at ¶ 64. Moreover, both individual defendants received "periodic sales reports and reports on consumer-fee revenue, as well as 'flash reports,' which showed that [Providian's] improper sales and accounting practices were succeeding in inflating the Company's revenues." SAC at ¶ 63. This information should have notified Mehta and Petrini of Providian's remarkable success and simultaneously should have given them reason to verify the source of the success. Also, the reports from the legal collection department to senior management which indicated that late and overlimit fees were extraordinarily high should have roused the individual defendants' suspicions. Finally, it is alleged that the individual defendants approved or allowed the use of high-pressure and misleading scripted sales presentations by Providian's sale force to mislead customers into accepting non-interest fee-based products, or which facilitated the improper "adding on" of unwanted products to customers accounts. *Id.* at ¶ 65. In sum, the SAC alleges that Providian's illegal or fraudulent practices permeated core aspects of Providian's business and were so pervasive that Mehta and Petrini must have known or were reckless in not knowing. Plainly, these allegations suffice to establish facts that support a strong inference of knowledge or recklessness. Furthermore, having adequately established Mehta and Petrini's knowledge or recklessness, the SAC also adequately establishes recklessness on the part of Providian as an entity.

### IV. Conclusion

Given the Rule 12(b)(6) standard of review, the SAC alleges facts sufficient to

state a claim of securities fraud. The SAC sufficiently alleges a claim of misrepresentation and a claim of omission. Furthermore, the SAC sufficiently alleges the requisite scienter. Accordingly, the motion to dismiss on Rule 12(b)(6) grounds will be denied. The SAC also sufficiently alleges each of these elements with particularity. Accordingly, the motion to dismiss on Rule 9(b) and Reform Act grounds will also be denied.