Sisinia PRO

v.

Ronald DONATUCCI.

Ronald Donatucci, Register
of Wills, Appellant.

No. 95–1803.

United States Court of Appeals,
Third Circuit.

Argued March 26, 1996.

Decided April 26, 1996.

Michael F. Eichert, Chief Deputy City Solicitor (argued), E. Jane Hix, Deputy City

Solicitor, City of Philadelphia Law Dept., Philadelphia, PA, for Appellant.

H. Francis deLone, Jr. (argued), Philadelphia, PA, for Appellee.

Before: SLOVITER, Chief Judge, and GREENBERG and ROTH, Circuit Judges.

## OPINION

GREENBERG, Circuit Judge.

Appellee Sisinia Pro worked in the office of the Clerk of the Orphans' Court, under the general direction of Ronald Donatucci, Register of Wills of Philadelphia County. In October 1993, Donatucci's wife subpoenaed Pro to testify in her divorce action against Donatucci. Pro duly appeared pursuant to the subpoena, but was not called to testify. Donatucci was present in court and saw Pro there. Shortly thereafter, Donatucci sent Pro a letter terminating her employment.

Pro brought suit against Donatucci under 42 U.S.C. § 1983, claiming that he fired her in retaliation for activity protected by the First Amendment, that is, her appearance as a potential witness at the divorce proceeding. The district court denied Donatucci's motion for summary judgment in his individual capacity, which Donatucci predicated on a claim of qualified immunity. Donatucci then appealed. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 and we have jurisdiction under 28 U.S.C. § 1291 based upon the collateral order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *In re City of Philadelphia Litig.*, 49 F.3d 945, 956 (3d Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995).

■■■ Our review of the district court's denial of the motion for summary judgment is plenary. *Bieregu v. Reno*, 59 F.3d 1445, 1449 (3d Cir.1995); *In re City of Philadelphia Litig.*, 49 F.3d at 960. Moreover, we have plenary review over its denial of qualified immunity, as it is an issue of law. *In re City of Philadelphia Litig.*, 49 F.3d at 960. Of course, we will resolve all factual doubts and draw all reasonable inferences in favor of Pro, the nonmoving party. *Bieregu*, 59 F.3d at 1449.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background

Donatucci became Register of Wills of Philadelphia County in 1979 and Pro, who had been with him in his private law practice, came with him to be his secretary. Pro worked at that position for one year and then moved to the office of the Clerk of the Orphans' Court. The offices of the Orphans' Court and the Register of Wills overlap in their functions and staff, and therefore Pro remained under Donatucci's control even after she changed jobs.

In October 1993, Donatucci's wife subpoenaed Pro to testify in her divorce action against Donatucci. Pro duly appeared pursuant to the subpoena, but was not called to testify. The subject of her expected testimony, though, concerned an alleged extramarital affair involving Donatucci. A few weeks after Donatucci saw Pro at the divorce proceedings, he hired a new employee to work in the office of the Clerk of the Orphan's Court and that employee's assignments included work that Pro performed. Shortly thereafter, on January 3, 1994, Pro received a short letter from Donatucci, which informed her:

> As part of an on-going department reorganization, your position as Legal Secretary II will be eliminated as of Monday, January 17, 1994.

> We have appreciated your many years of service and I wish you well in the future.

*Pro v. Donatucci*, No. 94–6001, at 2 (E.D.Pa. Sept.6, 1995). Pro believed that Donatucci's explanation for her termination was a pretext and that he fired her because she was ready to testify at his divorce proceeding.

### B. Procedural History

■■■ Pro brought suit against Donatucci, alleging that he fired her in retaliation for activity protected by the First Amendment— that is, her appearance as a potential witness at the divorce proceeding. Although her complaint was ambiguous, the district court held that she sued Donatucci in both his individual and official capacities. *Pro v. Do-*

*natucci,* No. 94–6001, at 2 (E.D.Pa. Sept.6, 1995).[1] On July 14, 1995, Donatucci moved for summary judgment in his official capacity (apparently under the impression that he had not been sued in his individual capacity), arguing, in essence, that Pro could not state a claim because she had not testified at the divorce proceeding. On September 6, 1995, the court denied Donatucci's motion, holding "[w]e can see no practical distinction between retaliation on the basis of a public employee's actual testimony and the retaliation that Pro alleges." *Pro v. Donatucci,* No. 94–6001, at 4 n. 3 (E.D.Pa. Sept.6, 1995) (order denying defendant's summary judgment motion). Donatucci filed a motion for reconsideration and to amend the order so as to grant summary judgment to him in his individual capacity on the basis of qualified immunity.[2] The district court denied the motion on September 18, 1995, and Donatucci filed a notice of appeal on the same day. Donatucci contends that the district court erred in denying him summary judgment on the basis of qualified immunity.

## II. DISCUSSION

### A. Qualified Immunity

 The determination of whether a public official is entitled to qualified immunity in a civil rights action against him involves balancing "the important policy of compensating individuals for deprivation of their rights against 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *In re City of Philadelphia Litig.,* 49 F.3d at 960 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982)). In making this balance, as we recently noted in *In re City of Philadelphia Litig.,* "courts recognize that officials often must 'act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office.'" *Id.* at 961 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 246, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974)). Public officials thus are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. While this case does not involve the concerns about swift action to which we alluded in *In re City of Philadelphia Litig.,* nevertheless the case implicates principles of qualified immunity.

 The focus of qualified immunity is on the "objective legal reasonableness" of the actions taken by the public official.

1. *See Pro v. Donatucci,* No. 94–6001, at 1 n. 1, 1995 WL 552980 (E.D.Pa. Sept.18, 1995):

 We recognize that, normally, a court should determine the issue of qualified immunity well in advance of trial, and even before discovery, if possible. *Siegert v. Gilley,* 500 U.S. 226 [233–34], 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991). Here, however, because of an ambiguity in Pro's complaint, it only became clear two weeks ago that she had sued Donatucci in both his individual and official capacities. *See Pro v. Donatucci,* No. 94–6001 (E.D.Pa. September 6, 1995) (Order interpreting Pro's complaint to assert a claim against Donatucci in his individual capacity).

 At oral argument before us, counsel for Pro stated that she is not suing Donatucci in his official capacity, and that she therefore seeks only damages and not reinstatement to her position. In any event, we would address only Donatucci's claim of qualified immunity in this opinion.

2. Pro argued in the district court that Donatucci waived his right to assert the qualified immunity defense by failing to include it in his answer or

an amended answer, and she repeats that argument on this appeal. The district court decided, however, that because the question was one of law, it "[did] not require a more elaborate record than [it] already [had]," and that it therefore would reject Pro's demand for discovery on the defense and would consider it on the merits. *Pro v. Donatucci,* No. 94–6001, at 1–2, 1995 WL 552980 (E.D.Pa. Sept.18, 1995). Our court previously has taken the position that whether an affirmative defense that must be pleaded in the answer is waived will depend on whether the defense was raised "at a pragmatically sufficient time" and the plaintiff was prejudiced in the ability to respond. *See Charpentier v. Godsil,* 937 F.2d 859, 864 (3d Cir.1991). In this case, Donatucci made the general statement in his answer that he was asserting "all defenses available under 42 U.S.C. § 1983" and then explicitly raised the qualified immunity defense in his motion for summary judgment, which he filed just one day after the district court held for the first time that Pro had sued Donatucci in his individual capacity. In these circumstances, we believe that Donatucci adequately met the standard that we have followed. We therefore hold that he has not waived the defense of qualified immunity.

*Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). As the Supreme Court instructed in *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991), before a court even addresses a claim of qualified immunity, however, it first should determine whether a plaintiff has alleged "a violation of a constitutional right at all." "Deciding 'this purely legal question permits the courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits.'" *In re City of Philadelphia Litig.,* 49 F.3d at 961 (quoting *Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793).

■ Further, as we reiterated in *In re City of Philadelphia Litig.,* for a court to impose liability upon an official, the right allegedly violated "'must have been "clearly established" in a more particularized, and hence more relevant, sense.'" *Id.* at 961 (quoting *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039.

Therefore, in this case, we must consider whether the particular constitutional right asserted, if it existed at all, was clearly established at the time Donatucci fired Pro. *Acierno v. Cloutier,* 40 F.3d 597, 606 (3d Cir.1994) (in banc). As we summarized in *In re City of Philadelphia Litig.:*

> If the law is not established clearly when an official acts, he is entitled to qualified immunity because he 'could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.' ... On the other hand, if the law was established clearly, the official still may obtain qualified immunity if he claims 'extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard.'

*Id.* at 961 (citations omitted).

### B. Pro's First Amendment Rights

Pro's section 1983 claim is that Donatucci retaliated against her when she engaged in speech activity protected by the First Amendment. Donatucci, however, argues that he could not have violated Pro's rights under the First Amendment because she did not engage in speech entitled to First Amendment protection. Thus, he argues, since no constitutional violation occurred, he was entitled to summary judgment. Consequently, we must decide whether Pro has alleged a constitutional violation.

■ As we recently stated in *Watters v. City of Philadelphia,* 55 F.3d 886 (3d Cir. 1995), the Supreme Court has made clear that "it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal." *Id.* at 891 (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 572, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968)). In a line of cases beginning in the 1960's, the Court developed the principle that the government "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). Therefore, "[j]udicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech." *Watters,* 55 F.3d at 891 (citing *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987)).

■ On the other hand, the Court has recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. In determining whether the speech of an employee deserves constitutional protection, we therefore must strike a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734–35.

▆ As noted in *Watters,* we analyze a public employee's claim of retaliation for engaging in protected activity under a three-step process. 55 F.3d at 892. First, the plaintiff must show that the activity in question was protected. *Id.* (citing *Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993); *Czurlanis v. Albanese,* 721 F.2d 98, 103 (3d Cir.1983)). To deserve protection, "the speech must be on a matter of public concern, and the employee's interest in expression on this matter must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees." *Id.* (citing *Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (plurality opinion)).

Second, the plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). Finally, the employer can establish that it would have taken the adverse employment action regardless of whether the employee had engaged in protected conduct. *Id.* These latter two questions are factual, and therefore for purposes of this appeal we resolve them in Pro's favor. Thus, the threshold issue before us in determining whether Donatucci was entitled to summary judgment is whether Pro's activity was speech and, if so, was on a matter of public concern.

▆ "An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Holder,* 987 F.2d at 195 (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690). As the Supreme Court held in *Connick,* this principle is based upon the idea that

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147, 103 S.Ct. at 1690. The public concern inquiry is a legal one, to be determined by reference to the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48 & n. 7, 103 S.Ct. at 1690 & n. 7. We discussed this analysis in *Holder:*

> The content of the speech may help to characterize it as relating to a matter of social or political concern of the community if, for example, the speaker seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials. The form and context of the speech may help to characterize it as relating to a matter of social or political concern to the community if, for example, the forum where the speech activity takes place is not confined merely to the public office where the speaker is employed.

987 F.2d at 195 (citations omitted). A conclusion that the speech concerns private rather than public matter makes it unnecessary to proceed to a consideration of the employer's interests. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689–90.

▆ In this case, the district court held that Pro's potential speech was a matter of public concern not because of its content, which would have been testimony about a purely private matter, but because of its form and context—that is, potential "sworn testimony before an adjudicatory body." *Pro v. Donatucci,* No. 94–6001, at 3 (E.D.Pa. Sept.6, 1995) (quoting *Freeman v. McKellar,* 795 F.Supp. 733, 739 (E.D.Pa.1992)). The court relied on a line of cases decided by the Court of Appeals for the Fifth Circuit holding that a public employee's truthful testimony receives constitutional protection regardless of its content. *See Pro v. Donatucci,* No. 94–6001, at 3–4, 1995 WL 552980 (E.D.Pa. Sept.18, 1995) (citing *Reeves v. Claiborne County Bd. of Educ.,* 828 F.2d 1096, 1100–01 (5th Cir.1987); *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1578 (5th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990)). The court also relied on two district court decisions within this circuit that have fol-

lowed the approach of the Court of Appeals for the Fifth Circuit. *Id.* at 3 (citing *Freeman v. McKellar,* 795 F.Supp. at 739–40) ("A public employee's sworn testimony before an adjudicatory body has been held to be inherently a matter of public concern and protected by the First Amendment."); *Hoopes v. Nacrelli,* 512 F.Supp. 363, 365 (E.D.Pa.1981) (same) (cited in *Freeman v. McKellar,* 795 F.Supp. at 739). The district court did note, however, that one court of appeals explicitly has declined to adopt the Court of Appeals for the Fifth Circuit's approach, *id.* (citing *Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492, 1505 (7th Cir.1994)), and that another court of appeals has emphasized the importance of content and form over context, *id.* (citing *Arvinger v. Mayor and City Council of Baltimore,* 862 F.2d 75, 79 (4th Cir.1988)).

Donatucci urges us to reverse the district court's decision. First, he correctly points out that it seems that no reported case addresses whether the act of responding to a subpoena to testify in a civil matter is protected speech. *See Pro v. Donatucci,* No. 94–6001, at 9, 1995 WL 552980 (E.D.Pa. Sept.18, 1995) ("Donatucci is correct that neither we nor the parties have found a case conferring constitutional protection on a witness who appeared at trial pursuant to a subpoena but did not testify."). Second, he states as follows:

> Pro was not subpoenaed to offer testimony regarding practices and policies of the Office of the Register of Wills. Rather, she was subpoenaed to testify in the Donatucci divorce proceeding about purely private matters. She makes absolutely no claim that her testimony would have had anything to do with public concerns. To the contrary, she admits that she learned after she responded to the subpoena that her testimony would have concerned a purely private matter that occurred during the first year of her employment in the Office of the Register of Wills.

Br. at 17.

Finally, Donatucci argues that Pro's would-be testimony cannot even fall under the First Amendment protection provided to testimony before an adjudicatory body by the line of cases of the Court of Appeals for the Fifth Circuit. *Id.* at 19. That court, he states, announced that its formulation constitutes the "outer boundaries" of First Amendment protection, and because "Pro was not subpoenaed to testify regarding any controversy in the office of the Register of Wills," and "was not called to provide even neutral testimony regarding the operation or the policies of the Office of the Register of Wills," her testimony is not protected under that court's formulation of the public concern doctrine. *Id.* (citing *Reeves,* 828 F.2d at 1100).

As noted by the district court, the precise issue in this case seems to be one of first impression, at least in this circuit. In deciding the case, then, we must look to cases that are as closely analogous to the one before us as possible.

The Court of Appeals for the Fifth Circuit has concluded that a public employee's truthful testimony before an adjudicatory body is inherently a matter of public concern protected by the First Amendment. In *Reeves,* the plaintiff was a full-time administrator in the county school system, with 30 years of service. 828 F.2d at 1097. The school board sought to fire several teaching assistants in the belief that the assistants had participated in a political campaign. *Id.* at 1097–98. Reeves was not part of this group, but received a subpoena to testify in the assistants' subsequent civil suit. *Id.* at 1098. She duly appeared, and her testimony, while "generally 'neutral,'" did help the plaintiffs (*i.e.,* the teaching assistants) on certain factual issues. *Id.* The plaintiffs prevailed, and, four days later, the county superintendent of education with the permission of the board reassigned Reeves to a new position and began to strip her of her "longtime perquisites." *Id.*

Reeves filed a section 1983 complaint, alleging that the school board and the county superintendent retaliated against her because she had testified in the assistants' civil suit. *Id.* at 1099. She prevailed in the district court against the superintendent at a bench trial, and the court of appeals affirmed that decision. *Id.* at 1101.

In explaining its holding, the court stated:

An individual's fear of official retribution could inhibit the willingness of the witness to testify truthfully. Not only would the first amendment right of the witness be infringed by this type of coercion, the judicial interest in attempting to resolve disputes by arriving at the truth would be in jeopardy. Furthermore, a witness who succumbed to any real or imagined coercion could also be subject to a charge of perjury. Of course, it is the duty of every person to testify truthfully before a duly constituted tribunal.... Yet, '[t]hese values, along with the first amendment values, would not be served' if the fear of retaliation and reprisal 'effectively muzzled' witnesses testifying in open court.

*Id.* at 1100 (citations omitted).

The court went on to say that these principles lead to no meaningful distinction between testimony in a criminal proceeding and testimony in a civil proceeding, and that: "Our judicial system is designed to resolve disputes, to right wrongs. We encourage uninhibited testimony, under penalty of perjury, in an attempt to arrive at the truth." *Id.* The court thereafter upheld the district court's conclusion that Reeves had been discharged for exercising her right of free expression protected by the First Amendment.

We agree with the district court's analysis of *Reeves* and its applicability to this case. First, the language of "outer boundaries" on which Donatucci relies did not appear in the court's holding in *Reeves,* but in its statement of the issue: "The question is whether Reeves' generally factual testimony concerning the reading program in the Claiborne County school district comes within the outer boundaries of first amendment protection." *Id.* at 1100. Thus, we agree with the district court that the court of appeals did not hold that *Reeves* should set the "outer boundaries" of First Amendment protection. Second, as the district court noted, *Reeves* emphasized the context and form of protected speech activity, rather than its content. Third, we also agree with the district court that the *Reeves* court explicitly relied upon the "judicial interest in attempting to resolve disputes by arriving at the truth," *id.* at 1100, in formulating its decision. Thus, we dis-

agree with Donatucci that *Reeves* is inapplicable here.

A later decision of the Court of Appeals for the Fifth Circuit expanded upon *Reeves.* In *Johnston v. Harris County Flood Control Dist.,* 869 F.2d at 1577, the court first noted that "[u]nder certain circumstances ... the context in which the employee speaks may be sufficient to elevate the speech to the level of public concern," and then explained that:

When an employee testifies before an official government adjudicatory or fact-finding body he speaks in a context that is inherently of public concern.... If employers were free to retaliate against employees who provide truthful, but damaging, testimony about their employers, they would force the employees to make a difficult choice. Employees either could testify truthfully and lose their jobs or could lie to the tribunal and protect their job security. Those able to risk job security would suffer state-sponsored retaliation for speaking the truth before a body entrusted with the task of discovering the truth. Those unwilling or unable to risk unemployment would scuttle our efforts to arrive at the truth.

*Id.* at 1578.

In line with the decisions in these cases, we agree with the district court that Pro had a First Amendment right to respond to Mrs. Donatucci's subpoena to appear at the divorce proceeding. As the district court stated:

The real issue after *Johnston* and *Reeves* is control. In the context of the workplace, a public employee can normally choose to speak, or not to speak, on issues that may incur the wrath of his superiors. A subpoenaed witness has no choice but to appear at a trial, unless he is willing to risk a finding of contempt. Nor does the subpoenaed witness normally have a say in whether he will be called to testify. Retaliation in these circumstances inflicts a punishment on a public employee for performing an act that he could not choose to avoid.

*Pro v. Donatucci,* No. 94–6001, at 13–14, 1995 WL 552980 (E.D.Pa. Sept.18, 1995).

We recognize that our holding may be somewhat inconsistent with opinions of the Courts of Appeals for the Fourth and Seventh Circuits. In *Arvinger v. Mayor and City Council of Baltimore*, 862 F.2d at 79, the district court held that a public employee's comments during a fair employment hearing touched on a matter of public concern. *Id.* at 77. The Court of Appeals for the Fourth Circuit reversed, chiding the district court for "improperly elevat[ing] context over content." *Id.* at 79. However, in *Holder v. City of Allentown*, 987 F.2d at 195, we held that context, content, and form all play important roles in the constitutional analysis. Thus, our result is consistent with the law as it has developed in this circuit.

Also, in *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d at 1505, the Court of Appeals for the Seventh Circuit described the approach adopted by the Court of Appeals for the Fifth Circuit as a "blanket rule according absolute First Amendment protection to communications made in the course of a lawsuit," which it explicitly declined to follow. We, however, believe that the public employee's interest in responding to a subpoena and the judicial interest in having state employees respond to subpoenas without fear of employer reprisal justify our ruling. Moreover, we agree with the district court that there is no "practical distinction between retaliation on the basis of a public employee's actual testimony and the retaliation that Pro alleges." *Pro v. Donatucci*, No. 94–6001, at 4 n. 3, 1995 WL 552980 (E.D.Pa. Sept.18, 1995). Facts in the record before the district court established that Pro appeared at the Donatucci divorce proceeding, pursuant to subpoena and ready to testify truthfully, even though she did not testify. We hold that these facts constituted protected speech because, contextually, the speech was on a matter of public concern.[3]

Finally, the *Pickering* balancing test between an employee's interest in speaking and the employer's interest in regulating speech here weighs heavily in Pro's favor.[4] Pro alleges that Donatucci retaliated against her because of her potential speech in a divisive personal matter between Donatucci and his wife. The state had no legitimate interest in regulating this speech to "promot[e] the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35.

## C. Pro's Rights Were Clearly Established

 Donatucci also argues that, even if Pro had a First Amendment right to respond to the subpoena, that right was not clearly established at the time he acted, and he therefore is entitled to qualified immunity. The appropriate standard for qualified immunity, as set forth above, is whether "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *Good v. Dauphin County Social Servs.*, 891 F.2d 1087, 1092 (3d Cir.1989).

We agree with the district court that Pro's right to respond to the subpoena without fear of retaliation was clearly established at the

---

**3.** Pro appeared in court at the divorce trial in response to a subpoena. Accordingly, we have no reason to consider what result we would have reached if she had appeared voluntarily. Although Judge Roth, in dissent, characterizes our holding here as constitutionalizing "simple obedience to the law," dissent at 1292, we must point out that here, Pro's response to the subpoena clearly implicated the First Amendment—her potential testimony would have constituted speech itself, not expressive conduct, as the dissent describes her act of compliance with the subpoena. Thus we are not here "constitutionalizing compliance" with the law. Dissent at 1292.

**4.** By characterizing our holding as affording "absolute protection" to courtroom testimony regardless of its content, *see* dissent at 1296, Judge Roth seems to ignore our analysis of the *Pickering* balancing test altogether. We have not held that courtroom testimony should receive "absolute" First Amendment protection. On the contrary, we have held that the context of such speech raises the speech to a level of public concern regardless of its content, which in turn affords otherwise unprotected speech First Amendment protection. This protection, however, is not "absolute." The interests of the employee in speaking and the employer in regulating the speech must then be balanced against one another, as in any First Amendment balancing context, and that is exactly what we did. Judge Roth thus misstates both our holding and First Amendment jurisprudence.

time Donatucci acted. In *Bieregu v. Reno,* 59 F.3d at 1459, we noted that "the absence of a previous decision from our court on the constitutionality of the conduct at issue is not dispositive" in determining whether the particular constitutional right at issue was clearly established at a particular time, and stated that the standard "require[s] 'some but not precise factual correspondence between relevant precedents and the conduct at issue,'" *id.* (citing *In re City of Philadelphia Litig.,* 49 F.3d at 970) in order to be satisfied. Moreover, *Bieregu* found law to be clearly established despite a circuit split, as long as "no gaping divide has emerged in the jurisprudence such that defendants could reasonably expect this circuit to rule" to the contrary. 59 F.3d at 1458–59. Thus, the split between the Courts of Appeals for the Fifth and the Fourth[5] Circuits at the time of Donatucci's actions does not preclude our deciding that Pro's right to respond to the subpoena was clearly established.

*Reeves* and *Johnston* provided Donatucci with caselaw from which a reasonable official in his position should have realized that Pro had a First Amendment right to respond to the subpoena. Moreover, a then recent district court case in this circuit had followed the reasoning of the Fifth Circuit, providing even more reference for a reasonable official in Donatucci's position. *See Freeman v. McKellar,* 795 F.Supp. at 739–40 ("A public employee's sworn testimony before an adjudicatory body has been held to be inherently a matter of public concern and protected by the First Amendment."); *see also Hoopes v. Nacrelli,* 512 F.Supp. at 365 (same). We agree with the district court that:

> [a] reasonable government official in Donatucci's position would be intimately familiar with the[ ] policy concerns that underlie *Reeves.* By operation of statute and practice, the functions of the Register of Wills overlap with the functions of the Orphans' Court. Indeed, the Register of Wills has the power to issue subpoenas and to enforce compliance with those subpoenas. A

reasonable Register of Wills would understand the need to protect witnesses from retaliation for compliance with lawfully issued subpoenas, regardless of whether the witnesses ultimately testified. Like an officer of any court, a reasonable Register of Wills has a powerful interest in protecting subpoenaed witnesses from retaliation for compliance with those commands. A contrary proposition would ultimately undermine both the authority of his position and his ability to carry out his duties.

*Pro v. Donatucci,* No. 94–6001, at 14, 1995 WL 552980 (E.D.Pa. Sept.18, 1995).

## III. CONCLUSION

For all the reasons detailed above, we will affirm the district court's September 18, 1995 order denying summary judgment and denying qualified immunity to Donatucci.

ROTH, Circuit Judge, dissenting:

Sisinia Pro alleges that she was fired because she complied with a subpoena. This would clearly be wrong, and, if so, I have no doubt that Pro can establish some viable claim. In my opinion, however, she cannot establish the claim on which she chose to sue, a cause of action under 42 U.S.C. § 1983 for a violation of her First Amendment rights. The majority elects to save Pro's claim by constitutionalizing compliance with a subpoena. Under this formulation, simple obedience to the law becomes free speech. I respectfully dissent.

1. .

The crux of my difficulty with the majority's decision turns on one simple point: Compliance with a subpoena is not speech. In light of this basic fact, the complex and sophisticated arguments of the majority all come to naught. A free speech claim depends on speech, and there was none in this case.

5. The district court correctly noted that, although the Court of Appeals for the Seventh Circuit now has rejected what it perceived as the Court of Appeals for the Fifth Circuit's "absolute rule" protecting trial testimony, *Wright,* 40 F.3d at 1505, it decided that case ten months after Pro's termination. Thus, the case is not applicable to our determination of whether Pro's right was clearly established at the time Donatucci acted.

The record makes clear that Pro never testified. She simply appeared. As a result, there was no speech in its traditional, linguistic sense. This, of course, is not dispositive. Like Nereus, speech in its constitutional sense can take many forms. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (burning American flag); *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing black armbands); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (burning draft registration card). Because of these often elusive permutations, whether a given activity constitutes speech represents a threshold question in every First Amendment case. The issue may sometimes be sidestepped—the parties may agree to treat certain conduct as speech, or a court may assume that certain conduct is speech—but the question is always there. *See Texas v. Johnson,* 491 U.S. 397, 403, 109 S.Ct. 2533, 2538, 105 L.Ed.2d 342 (1989) ("We must first determine whether Johnson's burning of the flag constituted expressive conduct, permitting him to invoke the First Amendment in challenging his conviction."). I am confident that under the principles established by the Supreme Court, compliance with a subpoena is not speech.

In approaching the First Amendment, the Supreme Court has consistently emphasized the expressive, communicative dimension of speech. The Court's ringing descriptions of the First Amendment's role and purpose focus on this aspect. *See, e.g., Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) ("The First Amendment 'was fashioned to assure *unfettered interchange of ideas* for the bringing about of political and social changes desired by the people.'" (citations omitted, emphasis added)); *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) (the public's interest in *"free and uninhibited debate"* on matters of public importance" is "the core value of the Free Speech Clause" (emphasis added)). The Court's recent applications of the Amendment to concrete situations likewise stress this element. *See, e.g., Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* —— U.S. ——, ——, 115 S.Ct. 2338, 2348, 132 L.Ed.2d 487 (1995) (holding South Boston parade "expressive" and hence state law requiring inclusion of particular message violated parade-organizer's right of free speech); *United States v. National Treasury Employees Union,* —— U.S. ——, ——, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995) (noting that federal law prohibiting honoraria burdened "expressive activities" of government employees). Throughout First Amendment jurisprudence, expression and communication are the crucial attributes of speech. Put simply, "[t]he scope of the First Amendment is determined by the content of expressive activity." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 420, 112 S.Ct. 2538, 2563, 120 L.Ed.2d 305 (1992) (Stevens, J., concurring).

Nowhere is this stress on expression and communication more clear than in the Court's approach to speech that falls outside the traditional domain of the spoken or written word. The Amendment's purview extends not to conduct in general, but rather to *expressive* conduct. *See R.A.V.,* 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) ("The First Amendment generally prevents government from proscribing speech, or even *expressive* conduct.") (citations omitted, emphasis added); *Smith v. Goguen,* 415 U.S. 566, 586, 94 S.Ct. 1242, 1253, 39 L.Ed.2d 605 (1974) ("Th[e First] Amendment, of course, applies to speech and not to conduct without substantial communicative intent and impact.") (White, J., concurring). The classic examples of conduct-as-speech all contain patently expressive messages. *See Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (burning American flag to protest Republican nomination of Ronald Reagan); *Tinker,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing black armband to protest American involvement in Vietnam); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (burning draft registration card to protest Vietnam war); *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (protesting segregation through sit-in); *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct.

1178, 87 L.Ed. 1628 (1943) (refusing to salute flag where salute symbolized adherence to set of political beliefs); *Stromberg v. California,* 283 U.S.. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (displaying red flag to protest organized government).

Some basic communicative dimension is thus a prerequisite for conduct to qualify as speech. But the Supreme Court has gone further: Not all conduct that is expressive constitutes speech in its constitutional sense. The Court made this clear from the outset in the seminal case of *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). While recognizing the conceptual validity of symbolic speech, the Court rejected in the same breath the suggestion that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* at 376, 88 S.Ct. at 1678; *see also Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 570, 111 S.Ct. 2456, 2462, 115 L.Ed.2d 504 (1991) (finding insufficient the expressive content of public nudity; quoting *O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678). As the Court more recently observed, "It is possible to find some kernel of expression in almost every activity a person undertakes—for example walking down the street or meeting one's friends at the shopping mall—but such a kernel is not sufficient to bring the activity within the protections of the First Amendment." *City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989) (finding insufficient the expressive content of dance-hall gatherings).

The Court's *per curiam* decision in *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) has emerged as the primary guidepost in determining whether conduct having a communicative dimension is sufficiently expressive to qualify as speech. The conduct in *Spence* entailed the public display of an American flag emblazoned with a peace sign. *Id.* at 406, 94 S.Ct. at 2728. Even though the state conceded the point,

the Court took pains to explain that this act was expressive. It looked to the "communicative connotations" of the particular action or symbol, the context in which the activity occurred, and the intent of the speaker in delivering the message. *Id.* at 410, 94 S.Ct. at 2730. For the flag display, these factors allowed the court to conclude that "in the surrounding circumstances, the likelihood was great that the message would be understood by those who viewed it." *Id.* at 411, 94 S.Ct. at 2730. In other words, the message had clear communicative content of a constitutional magnitude.

The First Amendment tests crafted by this court have recognized and applied these principles. In *Steirer v. Bethlehem Area Sch. Dist.,* 987 F.2d 989 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 85, 126 L.Ed.2d 53 (1993), we relied on *Spence* to hold that expressive conduct will only constitute speech where there is a "[great] likelihood ... that the message would be understood." *Id.* at 995 (quoting *Spence,* 418 U.S. at 410–11, 94 S.Ct. at 2730). We also relied on additional language in *Spence* to require "[a]n intent to convey a particularized message." *Id.* This established a relatively high standard for communicative conduct. After the Supreme Court's decision in *Hurley* dispensed with the latter requirement, —— U.S. at ——, 115 S.Ct. at 2345, we set out a modified test for expressive conduct that retained the all-important communicative dimension. In *Troster v. Pennsylvania State Dept. of Corrections,* 65 F.3d 1086 (3d Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 708, 133 L.Ed.2d 663 (1996), we adopted as our standard "whether, considering the nature of the activity, combined with the factual context and environment in which it was undertaken, we are led to the conclusion that the activity was *sufficiently imbued with elements of communication* to fall within the scope of the First and Fourteenth Amendments." *Id.* at 1090 (emphasis added, citation omitted).[1] Consistent with Supreme

---

1. *Troster* intimated that a different standard might apply to compelled speech, as distinguished from restrictions on intellectual individualism. *See* 65 F.3d at 1089. I believe that any difference would go to the degree of expressiveness required for conduct to qualify as protected

speech, rather than to the threshold requirement of expressiveness itself. In my opinion, compliance with a subpoena fails the latter. To the extent that it also fails the former, I suggest that even if we assume that compelled speech requires a lesser degree of expressiveness to merit

Court precedent, conduct will only qualify as speech if it contains a degree of expression that merits constitutional protection.

Turning to the case at bar with these principles in mind, I find no communicative dimension in the act of complying with a subpoena. Unlike the decorated flag in *Spence*, compliance with a subpoena has no "communicative connotations." 418 U.S. at 410, 94 S.Ct. at 2730. It is impossible to draw any meaningful inference from the act. Compliance also lacks *Spence*'s element of context. Obeying a subpoena is a typical occurrence in everything from a garden variety hearing to a media-event trial. Compliance itself carries no expressive context. Finally, compliance lacks *Spence*'s element of intent. A person who obeys the command of a subpoena is merely obeying the law. She fulfills a requirement that society has imposed on her. She has not made any effort to communicate. She has delivered no message. No speech has yet occurred.

This should be dispositive. No communication means no speech. But even if I follow the Supreme Court's suggestion and search for the "kernel of expression [present] in almost every activity a person undertakes," *City of Dallas*, 490 U.S. at 25, 109 S.Ct. at 1595, I become more convinced. It might be argued that there are certain minimal communications that compliance with a subpoena could convey. Compliance could indicate respect for the law or deference to the court system. It could indicate recognition of the obligations of citizenship. Such messages are quintessentially generic. Any party, complying with any law, could be interpreted as expressing similar views. If these are the only messages that compliance with a subpoena carries, then it once again carries no message at all. Its message silently blends into the background of norms in which society functions.

Alternatively, in slightly more persuasive terms, it might be argued that compliance with a subpoena takes on some vicarious tinge of content based on the interests of the party that issues it. Compliance could also suggest a desire to testify on behalf of that party. Such arguments are equally generic protection, compliance with a subpoena would

and even more ambiguous. Because compliance with a subpoena is mandatory, compliance could just as easily indicate support for the opponent's cause that is not strong enough to overcome the disincentive of contempt sanctions. Once again, compliance carries no cognizable message.

Nevertheless, assuming *arguendo* that these messages were cognizable, I conclude from our precedents that the communications fall far short of constitutional magnitude. We have not hesitated to deny the constitutional appellation "speech" to conduct far more expressive than this. In *Troster*, a state prison guard refused to wear an American flag patch on his uniform. 65 F.3d at 1087. While recognizing the "various and somewhat imprecise ideas associated with [the flag]," *id.* at 1091, and noting that the Supreme Court has called the flag a symbol "[p]regnant with expressive content," *id.* (quoting *Texas v. Johnson*, 491 U.S. at 405, 109 S.Ct. at 2540), we nevertheless held that refusing to wear it could not "relay any message (ideological or otherwise) to anyone." *Id.* We found "no evidence that [the wearing of a flag patch] is likely to function in a communicative fashion." *Id.*

Similarly, in *Steirer*, albeit under the higher pre-*Hurley* standard, we dismissed the suggestion that compliance with a general requirement could constitute expressive conduct. In *Steirer*, certain high school students had challenged a school requirement that they fulfill sixty hours of community service before graduation. 987 F.2d at 990. We rejected the argument that "people in the community who see these students performing community service are likely to perceive their actions as an intended expression of a particularized message of their belief in the value of community service and altruism." *Id.* at 997. We instead concluded, "It is just as likely that students performing community service under the auspices of a highly publicized required school program will be viewed merely as students completing their high school graduation requirements." *Id.* Compliance with this general requirement still fall short.

lacked any "obviously expressive element." *Id.* at 995.

The legal requirement that a witness appear when subpoenaed bears some resemblance to a high school's requirement that students perform community service to graduate. Under *Steirer,* this type of conduct—even assuming it were expressive—is not sufficiently expressive. It certainly falls far short of the level of expression embodied in Troster's refusal to wear a flag patch on his uniform, which we likewise found insufficiently expressive. Compliance with a subpoena is simply not "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." 65 F.3d at 1090. Compliance is therefore not speech in its constitutional sense. Pro's termination did not violate her First Amendment rights, and her § 1983 claim must fail.

### 2.

The majority reaches the opposite conclusion by working in reverse. Rather than following the standard analytical steps in a First Amendment claim and beginning with the threshold question of whether compliance with a subpoena is speech, the majority constructs an elaborately subtle argument that starts from the premise that courtroom testimony is absolutely protected regardless of its content. The majority then moves backward, stretching the zone of protection accorded testimony to include compliance with a subpoena. Aside from ignoring the threshold issue of what constitutes speech, there are two problems with this argument. The central premise is dictum, and it is incorrect.

First, any discussion of the protected status of actual courtroom testimony is ultimately *obiter dictum.* At oral argument, counsel for the City of Philadelphia conceded that if Pro had in fact testified, her testimony would have been automatically and absolutely protected. Any holding on this issue is therefore superfluous.

More importantly, any holding that Pro's testimony at trial would be absolutely protected regardless of its content is incorrect. As a government employee, Pro's free speech activity is only protected if it meets a two part test: The communication must address a matter of public concern, and the employee's interest in the expression must not be outweighed by the interest of the state-as-employer in promoting the efficiency of its public service. *Watters v. City of Philadelphia,* 55 F.3d 886, 893 (3d Cir.1995) (citing *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). Although I agree with the majority that Pro can satisfy the latter element, there is no indication that she can meet the former.

We have repeatedly held that whether speech is a matter of public concern turns on the "content, form, and context of a given statement, as revealed by the whole record." *See Watters* 55 F.3d at 892; *Swineford v. Snyder County,* 15 F.3d 1258, 1271 (3d Cir. 1994); *O'Donnell v. Yanchulis,* 875 F.2d 1059, 1061 (3d Cir.1989). A cursory survey of the cases shows that the three factors in this inquiry are not co-equal. In practice, we have looked almost exclusively to content.

Alternative formulations of the public concern element reveal the primacy of content. In *Holder v. City of Allentown,* 987 F.2d 188 (3d Cir.1993), we described a public concern as something "fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* at 195. In *Swineford v. Snyder County,* 15 F.3d 1258, 1271 (3d Cir.1994), we cited Supreme Court descriptions of public concerns as matters going to "the essence of self government," *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), matters on which "free and open debate is vital to informed decisionmaking by the electorate," *Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736, and matters as to which "debate ... should be uninhibited, robust, and wide open," *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). In *Sanguigni v. Pittsburgh Bd. of Public Educ.,* 968 F.2d 393 (3d Cir.1992), we identified categories of public concern that included "speech related to broad social or policy issues," *id.* at 397, speech implicating "the discharge of public responsibilities by an important government office, agency,

or institution," particularly speech "relat[ing] to the way in which a government office was serving the public," *id.* at 397–98, and speech on "alleged improprieties by a government office," *id.* at 398. This contrasted with non-public matters, such as "questions regarding office transfer policy, office morale, the need for a grievance committee, and the employee's level of confidence in supervisors." *Id.* at 399.[2]

The subjects that we have identified as matters of public concern further illustrate the primacy of content. *See Watters,* 55 F.3d at 891–95 (head of police-counseling program in Philadelphia police department criticizing lack of support for program); *O'Donnell,* 875 F.2d at 1061 (3d Cir.1989) (chief of police claiming township supervisors pressured police to "fix" citations); *Zamboni v. Stamler,* 847 F.2d 73, 77 (3d Cir.) (detective charging department reorganization violated state civil service laws), *cert. denied,* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988); *Rode v. Dellarciprete,* 845 F.2d 1195, 1201–02 (3d Cir.1988) (employee alleging discrimination in Pennsylvania State Police where issue had previously been subject of state legislative hearings); *Johnson v. Lincoln University,* 776 F.2d 443, 452 (3d Cir.1985) (professor at historically black university commenting on alleged lowering of academic standards and its effects on blacks); *Czurlanis v. Albanese,* 721 F.2d 98, 104 (3d Cir.1983) (employee criticizing county government practices as inefficient, at times fraudulent, and a waste of taxpayer money). These precedents show that the principal attribute of protected speech by a public employee is some content-laden communication regarding a subject of importance to the community as a whole.

Our treatment of "form and context" provides additional support for this conclusion. Although we have repeatedly mentioned these elements in discussing speech on a matter of public concern, the two factors have never played a controlling role in any opinion of this court. Instead, the types of "form and context" that we have considered

have largely operated as proxies for content. For example, we have taken additional notice of statements that are disseminated in public media, *Holder v. City of Allentown,* 987 F.2d 188, 195–96 (3d Cir.1993) (open letter to the editor in city newspaper), or delivered in an official proceeding, *Czurlanis,* 721 F.2d at 104 (stressing that allegations of mismanagement were made during time allotted to public at meeting of county board of supervisors). Both are indications that the substance of the message has significant importance to the community. We said as much in *Holder,* noting that the newspaper's decision to print the letter—the key factor creating its context—provided additional evidence of the letter's newsworthiness. 987 F.2d at 195. Consistent with this approach, in *Sanguigni* we found that context failed to indicate a matter of concern where statements appeared in a faculty newsletter otherwise devoted exclusively to topics such as "extra effort buttons, the 'April showers bingo,' the faculty lunch menu, the employee-of-the-month award, and the work of the Sunshine Committee." 968 F.2d at 399. Context in that case again operated as a proxy for content, demonstrating the private nature of the dispute.

This well-established line of cases indicates that if Pro had actually testified, her testimony would be evaluated under the "content, form, and context" standard. That inquiry would depend heavily on content, with form and context providing secondary evidence that her testimony could be "fairly considered as relating to any matter of political, social, or other concern to the community." *Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993). Pro did not, of course, testify, so there is no way to determine from this record whether her testimony would meet this standard. Nevertheless, it appears that Pro would face an uphill battle. She was called to testify at a proceeding between two private litigants. The subject matter of the dispute was a divorce action, the epitome of a private matter. The content of the

2. The exception to this rule is *San Filippo v. Bongiovanni,* 30 F.3d 424 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995), in which this court held that the First Amendment right to petition has no content re-

quirement. Pro was a potential witness, not a litigant, and the right to petition is therefore not implicated in this case. To the extent that *San Filippo* applies by analogy, I believe that Judge Becker has the stronger argument in dissent.

proposed testimony appears to have been equally private—Pro has suggested that she was called to speak about an extra-marital affair. Absent some additional showing, Pro's testimony cannot meet the public concern requirement.

The majority declares otherwise, concluding that the form and context of courtroom testimony make it inherently a matter of public concern. To support its conclusion, the majority relies on a line of cases from the Court of Appeals for the Fifth Circuit, which has given blanket protection to any truthful testimony given in an adjudicatory proceeding. *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1568 (5th Cir. 1989) ("[w]hen an employee testifies before an official government adjudicatory or fact-finding body he speaks in a context that is inherently of public concern"), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990); *Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096 (5th Cir.1987) (protecting public school teacher from retaliatory demotion for truthful testimony as witness in civil proceeding). This blanket rule forms the linchpin in the majority's extension of First Amendment protection to compliance with a subpoena. As the majority explains, "there is no 'practical distinction between retaliation on the basis of a public employee's actual testimony and the retaliation that Pro alleges.'" *Majority Opinion* at 1291 (quoting *Pro v. Donatucci,* No. 94–6001, at 4 n. 3 (E.D.Pa. Sept.6, 1995)). Or, as the district court stated more plainly elsewhere, "This shift is important ..., because if testimony *qua* testimony receives First Amendment protection regardless of its content, then it is analytically irrelevant whether the speaker speaks at all." *Pro v. Donatucci,* No. 94–6001, at 11, 1995 WL 552980 (E.D.Pa. Sept.18, 1995).

Unfortunately, this is incorrect. As the examination of this court's precedent shows, giving blanket protection to all courtroom testimony breaks sharply with the law of this

circuit. It clearly contradicts our long-standing focus on content. It also departs from our past interpretations of form and context. The fact that testimony occurred in a courtroom is not a viable proxy for its importance to the community, it simply marks the place where the physical act of speaking occurred. The courtroom context, devoid of any examination of content, cannot support a blanket public concern rule.

This brings me to the point that I think ultimately drives the majority's opinion: the compelled "form" of subpoenaed testimony. *See Majority Opinion* at 1290. Here I would remind the court of the well-established principle it correctly set forth earlier in its opinion. This principle recognizes that although the public employee has free speech interests, "the state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Majority Opinion* at 1287 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734). Consequently, as the majority is equally correct to note, we must "strike a 'balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734).

Blanket protection of courtroom testimony upsets the balance. The rule is unrealistically broad and handcuffs the government-as-employer in areas where it should be able to act. Absolute protection for statements made in an adjudicatory hearing regardless of their content means that an employee who discloses prejudicial information in a civil case or proceeding, no matter how unconnected that proceeding is to his employment or how egregious the information, cannot be disciplined based on those statements.[3] The Court of Appeals for the Elev-

---

3. For example, assume that a public employee observes an automobile accident between two private parties. The employee is subpoenaed to testify in the subsequent tort action. During cross-examination, the employee testifies that she

knows exactly what time the accident occurred because she was skipping work to attend a baseball game and was concerned about missing the first pitch. Under the majority's rule, this testimony would be absolutely protected, despite the

enth Circuit has already rejected this rule on facts that prove its impracticality. *See Hansen v. Soldenwagner,* 19 F.3d 573 (11th Cir.1994) (refusing to find inherent First Amendment violation in termination of police officer following testimony during investigation into suspension of second officer, where first officer testified in abusive, vulgar, and unprofessional fashion about superiors in department and department practices); *see also Wright v. Illinois Dept. of Children & Family Servs.,* 40 F.3d 1492 (7th Cir.1994) (refusing to adopt Fifth Circuit's "blanket rule").

I believe that the public concern requirement, as this court has traditionally applied it, adequately protects the free speech rights of government employees while recognizing the government's need to act as an employer. The principles set out in our precedents protect much that occurs in a courtroom. Whenever an employee testifies on something "fairly considered as relating to any matter of political, social, or other concern to the community," *Holder,* 987 F.2d at 195, that testimony is protected. Moreover, form and context still operate to raise matters of semi-public content to public importance. Absolute protection does not extend, however, to purely private matters in purely private proceedings. This is the proper balance.

As a result, the majority is incorrect when it states (in dictum) that if Pro had testified, her testimony would be absolutely protected. Without this initial premise, there is no zone of protection that can be stretched to include compliance with a subpoena. The argument collapses. This is understandable, because as discussed in Part I, compliance with a subpoena is not only not speech on a matter of public concern, it is not even speech.

### 3.

For these reasons, I conclude that Pro has failed to establish a § 1983 claim for a violation of her First Amendment rights. As I noted at the outset, this does not mean that she has no recourse. This court would be rightfully concerned if an employer could terminate an employee with impunity simply because the employee appeared when commanded by subpoena. Fortunately, this is not the case. Pennsylvania law directly addresses this situation.

Like many states, Pennsylvania recognizes a common law cause of action for wrongful discharge where the reason for the discharge offends a clear mandate of public policy. *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974); *see also Innes v. Howell Corp.,* 76 F.3d 702 (6th Cir.1996) (noting public policy exception under Kentucky law); *Rafferty v. NYNEX Corp.,* 60 F.3d 844 (D.C.Cir.1995) (noting public policy exception under District of Columbia law); *Piekarski v. Home Owners Savings Bank, F.S.B.,* 956 F.2d 1484 (8th Cir.1992) (noting public policy exception under Minnesota law); *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980) (recognizing public policy exception under New Jersey law). This cause of action extends to all employees, including private employees at will. *See Clark v. Modern Group Ltd.,* 9 F.3d 321 (3d Cir.1993) (discussing Pennsylvania's public policy exception). There appears to be no reason why it would not cover Pro's employment situation.

fact that it addressed a private matter in a private proceeding. The government-as-employer could not reprimand or otherwise discipline this employee, simply because the disclosure occurred in a courtroom. Other types of proceedings might produce more egregious statements. In the course of a hypothetical divorce action or child custody proceeding, an employee could let slip that she had moonlighted against company policy to increase her income, had falsified aspects of her background or qualifications, or had pilfered items of company property. Under the blanket rule, these statements would be protected. And as to more serious difficulties suggested by the last examples, presumably some legal fiction could be constructed so that an employee fired after confessing to a felony on the stand could be terminated based on the conviction, rather than based on testimony given "before an official government adjudicatory or fact-finding body." *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1568 (5th Cir.1989). Because the well-established principles of the public concern test adequately protect employees without handcuffing the government-as-employer, there is no need to invite these complications by adopting an absolute rule protecting testimony.

Pennsylvania's public policy exception protects employees from being forced to commit illegal acts as a condition of their employment. It also prevents employers from using an employee's compliance with legal requirements as a basis for termination. The seminal case in this area recognized an action for wrongful termination grounded in the public policy exception where an employee was terminated for complying with a statutory duty to serve on a jury. *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (1978).

The duty to comply with a subpoena is directly analogous to the duty to serve on a jury. Indeed, the basis for the Pennsylvania Superior Court's decision in *Reuther* was its recognition that under Pennsylvania law, a "[s]ummons for jury service ... shall be deemed summonses of the court...." 386 A.2d at 120. *Reuther*'s rule therefore logically applies to a subpoena, which by definition is a summons of the court. At least one decision from the district courts of this circuit has extended the Pennsylvania public policy exception to cover termination for responding to a subpoena. *See Keiser v. North Am. Life Assur. Co.,* 1986 WL 4829 at *1 (E.D.Pa. Apr.18, 1986) (Clifford Scott Green, J.). Other states have similarly extended their public policy exceptions to cover termination for compliance with a subpoena. *See Garner v. Morrison Knudsen Corp.,* 456 S.E.2d 907 (S.C.1995); *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975); *Williams v. Hillhaven Corp.,* 91 N.C.App. 35, 370 S.E.2d 423 (1988). I am confident that the Pennsylvania courts would have recognized a wrongful discharge claim on the facts of this case.[4]

Although the scope of First Amendment protection clearly cannot depend on the presence or absence of alternative remedies, the existence of a state law claim does much to address the otherwise troubling equities in this case. Pennsylvania law, not 42 U.S.C. § 1983, provides the appropriate means of redress for Pro's termination. Consequently, constitutionalizing compliance with a subpoena is not only incorrect, it is unnecessary.

### 4.

Sisinia Pro was wrongfully terminated for complying with a subpoena. Unfortunately, she chose to sue under the wrong cause of action. When Pro complied with the subpoena, she was simply obeying the law. Obedience to the law is not free speech. The resulting termination, while retaliatory and wrongful, was therefore not a violation of Pro's First Amendment rights. I would reverse the district court's denial of defendant's motion for summary judgment, and I would enter judgment in the defendant's favor.

---

**4.** In addition, my disposition of Pro's § 1983 First Amendment claim would not foreclose other challenges that she may have had available. It is well-established that under certain circumstances, termination of a public employee can violate the due process clause. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Blanding v. Pennsylvania State Police,* 12 F.3d 1303 (3d Cir.1993). Pro may also have an action for breach of contract. These theories are familiar figures in § 1983 actions alleging retaliatory termination for exercise of First Amendment rights. *See, e.g.,*

*Sanguigni,* 968 F.2d at 396 ("Sanguigni filed this action ... alleging that defendants had violated her freedom of speech, freedom of association, and due process. She also noted various pendent state claims."). Pro's complaint, however, did not mention these other claims. The model of minimalism filed in this action alleged only one count in exactly twelve numbered paragraphs. With nothing to contradict my faith in counsel's diligence, I assume that Pro's attorney recognized these alternatives when selecting his litigation strategy, but shifted to a § 1983 claim because of other considerations.